UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SANTI EUGENE BARNES,

        Petitioner,

v.                                Case No. 3:18-cv-566-MMH-JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## **ORDER**

### I. Status

      Petitioner Santi Barnes, an inmate of the Florida penal system, initiated this action, with the assistance of counsel, on April 25, 2018, by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1). Barnes is proceeding on an amended petition (Amended Petition; Doc. 3). In the Amended Petition, Barnes challenges a 2014 state court (Duval County, Florida) judgment of conviction for aggravated battery while in possession of a weapon. Barnes raises two grounds for relief. See Amended Petition at 15-38.[1]

Respondents have submitted a memorandum in opposition to the Petition. See

---

[1] For purposes of reference, the Court will cite the page number assigned by the Court's electronic docketing system.

Answer in Response to Order to Show Cause (Response; Doc. 8) with exhibits (Resp. Ex.). Barnes filed a brief in reply. See Petitioner's Reply to Response to 28 U.S.C. § 2254 Petition (Reply; Doc. 11). This case is ripe for review.

## II. Relevant Procedural History

On July 8, 2013, the State of Florida (State) charged Barnes with one count of attempted second-degree murder with a weapon. Resp. Ex. A at 15-20. Following a trial, a jury convicted Barnes of the lesser-included offense of aggravated battery, with a specific finding that Barnes carried, displayed, or used a weapon during the commission of the offense. Id. at 64. On April 3, 2014, the circuit court sentenced Barnes to a term of incarceration of fifteen years in prison. Id. at 100-05.

Barnes appealed his judgment and sentence to Florida's First District Court of Appeal (First DCA). Id. at 112. In his initial brief, Barnes, with the assistance of counsel, argued that the circuit court erred in admitting irrelevant and unduly prejudicial testimony from his employer. Resp. Ex. C. The State filed an answer brief. Resp. Ex. D. On January 16, 2015, the First DCA per curiam affirmed Barnes' conviction and sentence without a written opinion and issued the mandate on February 3, 2015. Resp. Ex. E.

On March 31, 2016, Barnes, with the assistance of counsel, filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (Rule 3.850 Motion). Resp. Ex. F at 1-24. In the Rule 3.850 Motion, Barnes

alleged his counsel was deficient for: (1) eliciting damaging testimony during the cross examination of Nicole Leiss; (2) failing to retain a DNA expert to test an aluminum bat for the presence of a third person's DNA; and (3) advising him not to testify at trial. Id. Barnes also alleged a fourth ground for relief, arguing that the cumulative effect of these errors prejudiced him. Id. The circuit court denied the Rule 3.850 Motion. Id. at 27-37. On February 6, 2018, the First DCA per curiam affirmed the denial of relief without a written opinion and issued the mandate on April 16, 2018. Resp. Ex. J.

### III. One-Year Limitations Period

This proceeding was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016), cert. denied, 137 S. Ct. 2245 (2017). "It follows that if the record refutes the applicant's factual allegations or otherwise

precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Schriro</u>, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Barnes's] claim[s] without further factual development," <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" <u>Id.</u> (quoting <u>Hill v. Humphrey</u>, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. <u>See</u> <u>Marshall v. Sec'y, Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need

not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different

> conclusion in the first instance.'"[2] <u>Titlow</u>, 571 U.S. at
> ---, 134 S. Ct. at 15 (quoting <u>Wood v. Allen</u>, 558 U.S.
> 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

<u>Tharpe v. Warden</u>, 834 F.3d 1323, 1337 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 2298 (2017). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

---

[2] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." <u>Clark v. Att'y Gen., Fla.</u>, 821 F.3d 1270, 1286 n.3 (11th Cir. 2016), <u>cert</u>. <u>denied</u>, 137 S. Ct. 1103 (2017).

## B. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [<u>Strickland,</u>] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. <u>Id.</u>, at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687, 104 S. Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, - U.S. at -, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not

> disturb a state-court decision denying the claim.
> Richter, - U.S. at -, 131 S. Ct. at 788.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014); Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference--this one to a state court's decision--when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

In Ground One, Barnes alleges that his trial counsel was deficient for negating Barnes' self-defense theory during the cross-examination of Nicole Leiss. Amended Petition at 15-26. Specifically, Barnes contends that his counsel asked Leiss, who recounted to the jury a conversation she had with Barnes following the incident, several times whether she felt Barnes' story regarding self-defense was sincere, to which Leiss repeatedly stated she did not find it sincere. Id. According to Barnes, this testimony prejudiced him because the jury only heard Barnes' self-defense theory through Leiss' testimony, which she stated was insincere. Id. Barnes believes this prejudiced

him because the prosecution relied on Leiss' testimony during its closing to argue that Barnes' defense theory was not credible. Id.

Barnes raised a similar claim as ground one of his Rule 3.850 Motion. Resp. Ex. F at 4-12. In denying relief on this claim, the circuit court explained:

> This Court finds counsel did not render deficient performance as alleged by Defendant in this ground for relief. Foremost, counsel elicited from Ms. Leiss that she did not witness the incident at issue. Ms. Leiss testified that after Defendant returned from Jacksonville to their home in Putnam County, Defendant told her he had defensive wounds and bruises on his ribs and back of his head from a fight. In response to counsel's questions, Ms. Leiss admitted she could not see Defendant's wounds because it was dark outside. Defendant also told Ms. Leiss that he needed to call the police about the incident because two men tried to kill him multiple times and he acted in self-defense. According to Ms. Leiss, Defendant appeared "pretty shaken up" when he returned home and spoke with her.
>
> Ms. Leiss did testify she believed Defendant's statements about having acted in self-defense were not sincere. However, Defendant has neglected to acknowledge counsel's subsequent questioning of Ms. Leiss. Such questioning showed Ms. Leiss believed Defendant was insincere in his claims of self-defense because she "just couldn't believe he did something like that" not because she had actual knowledge about whether Defendant acted in self-defense. Counsel's further questioning demonstrated Ms. Leiss believed Defendant was sincere when he said he would protect her, their son, and himself if their lives were threatened, just like he did on the night in question. In addition, counsel elicited from Ms. Leiss that if someone was trying to kill Defendant, she believed he would have protected himself. Most importantly,

counsel tied together his questions to Ms. Leiss when he cross-examined Deputy Parish-Woodie from the Putnam County Sheriff's Office. Counsel elicited from the Deputy that even if Ms. Leiss told her Defendant was lying about the incident, "[e]verything would have been the same" with respect to her investigation of Defendant.

Placed in context and in light of counsel's subsequent questioning of Ms. Leiss and Deputy Parish-Woodie during cross-examination, this Court finds counsel's questions about Defendant being sincere did not constitute deficient performance that caused his case prejudice. As such, Defendant has not met his postconviction burdens under Strickland. In view of the foregoing, Ground One is denied.

Id. at 29-30 (record citations omitted). The First DCA per curiam affirmed the denial of relief as to this claim without issuing a written opinion. Resp. Ex. J.

To the extent that the First DCA decided the claim on the merits,[3] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence

---

[3] Throughout this order, in looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

presented in the state court proceedings. Thus, Barnes is not entitled to relief on the basis of this claim.

Nevertheless, even if the First DCA's adjudication of this claim is not entitled to deference, for the reasons discussed below, the claim in Ground One is without merit. Under Florida law, in order to justifiably use deadly force, a person must "reasonably [believe] that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." § 776.012(1), Fla. Stat. (2013). Accordingly, a review of the trial evidence is necessary to give this claim context and determine whether the evidence supported a finding that the victim posed an imminent threat to Barnes.

The record reflects that Alan Ringler lived in a tent in the woods behind a trailer park. Resp. Ex. B at 187. On June 9, 2013, the trailer park's security guard observed a gold-colored car enter the community twice, once around 8:15 p.m. and again around 9:00 p.m. Id. at 227-28. He recorded the license plate number of the vehicle each time, which matched. Id. That same day, Ringler and Barnes came to Flynn Blest's trailer around 8:00 or 9:00 p.m. to have a drink. Id. at 187-90. Blest had never seen Barnes before. Id. Blest testified that Ringler seemed jovial but Barnes was impaired from drinking and came across as nervous and jumpy. Id. After about twenty minutes, Ringler and Barnes left in Barnes' car. Id. at 190. Around 9:30 p.m., another resident of the trailer park

heard a repetitive banging noise, like something was hitting something. Id. at 198. When she looked outside, she saw a gold-colored car, later identified as Leiss' car, parked on the side of the road and a man walking around it who slammed the passenger door, threw something into the trunk, and then sped away in the vehicle. Id. at 199-201. Thirty to sixty minutes later, a lady and her son were walking their dog in the trailer park when they saw a man lying on the ground motionless. Id. at 207-211. Another man, who she identified in court as Barnes, approached them, went to view the body, came back to them and told them, with a smirk, that they should call 911. Id. at 207-14. Barnes then drove off in the gold-colored vehicle. Id. at 214.

When JSO arrived at the scene, they located Ringler lying in the grass with lacerations on the side of his skull and a large amount of blood on his head and body.[4] Id. at 240-42, 251-52, 308-09, 334-35. Near Ringler's motionless body was a picnic table that had beer cans, cigarettes, a lighter, and a cellphone on it. Id. at 242-43, 279-80. Two of the beers were unopened and had condensation on them, indicating to police that they had been put there quite recently. Id. at 243, 279-81. Officer Ron Brooks checked the call log of the

---

[4] According to the evidence presented, Ringler was beaten so badly that he spent two to three weeks in the surgical intensive care unit and ultimately released three months later into a rehabilitation center for people with diminished mental abilities. Resp. Ex. B at 467-70, 513. As a result of his injuries, Ringler was incompetent to testify. Id. at 513.

cellphone found on the table and used his personal cellphone to call the most commonly called number in the call log. Id. at 283. He was unsuccessful with his own number but tried again by using the cellphone recovered at the scene. Id. at 283-84. No one picked up initially, but soon thereafter the cellphone found on the table received a call from Leiss. Id. at 285. Leiss identified herself and said the phone belonged to Barnes, who she said was her boyfriend. Id. at 286. In vague terms, Brooks told Leiss that someone had been injured and advised her to tell Barnes to call him. Id. at 287. Brooks also ran the tag number the security guard had written down and determined that the gold-colored vehicle was registered to Leiss. Id. at 286-87.

Leiss testified at trial that after she received the call from Brooks, she called Barnes, who then came to her house. Id. at 361-64. She could tell Barnes was intoxicated, so she did not allow him into the house because she did not like how he acted when he was drunk. Id. at 365-66. Barnes told her his version of what happened with Ringler, which she recited to the jury. Id. at 366. According to Barnes, he picked up two men who needed a ride and he took them to their destination. Id. at 367. The men said they would give Barnes gas money but they did not, so a fight broke out. Id. Barnes told Leiss that the men had pushed, punched, and kicked him and then they ran way, at which point Barnes said he took a bat out of the trunk of the car, chased them down, and beat one of them in the skull with the bat. Id. at 367-69, 384-85. Leiss testified

15

that Barnes said that he beat one man so badly that the man would not be able to talk and would be eating oatmeal through a straw. Id. at 370-71, 375, 385. Barnes stated that he would call the police and tell them he dropped the men off, they tried to rob him, and he defended himself. Id. at 389. Barnes also later claimed that they stole his cellphone. Id. at 369. Soon thereafter, Barnes called the police; however, before they arrived to interview him, he went to the trunk of the car, grabbed something Leiss could not identify, and went to the woods near the house. Id. at 392. During Leiss' cross-examination, defense counsel asked multiple questions about whether she felt Barnes' story was sincere. Id. at 402-07. She answered that she did not think he was sincere because she could not believe Barnes did something like that. Id.

The prosecution played the recording of Barnes' phone call to police. Id. at 414-16. On the call, Barnes stated that he just got off work and had given two men a ride, but they attacked him and took his cellphone. Id. at 414. Barnes told the officer that he had enough time to go to his car and retrieve an aluminum bat, after which he hit both guys with the bat and hurt them "pretty bad." Id. at 414-15. After the phone conversation, police went to Leiss' house and conducted a face-to-face interview with Barnes. Id. at 417-18. A recording of that interview was played for the jury. Id. at 419-33.

During the interview, Barnes said that he went to work but his employer did not need him that night, so he went to a convenience store where two older

men approached him about getting a ride and he obliged. Id. at 422. They promised to give him gas money, but they never did. Id. at 423-24. Eventually he got them to their location and once there, the man in the backseat got out of the car and ran away. Id. at 424. Barnes said he then went to a tree to urinate, at which point he was attacked, first by the man who remained in the front seat of the car and then by the man who had ran away. Id. He fought both of them off, kicking the guy in the front seat in the head a couple of times. Id. at 426. According to Barnes, he then chased down the other guy who was running from him, hit him in the back of the head a couple of times, and then stomped on his head. Id. at 426-27. Barnes also stated that the two men did not hit him that much, but that he "went at them hard." Id. at 429. Notably, Barnes said that his cellphone was not stolen but that it was lost in the tussle. Id. at 430. Barnes also never mentioned he used a bat. Id. at 435, 450-51. The officer who conducted the interview did not observe any wounds on Barnes and, after canvassing the wood line near the house, found an aluminum bat. Id. at 434, 439. That bat was later tested and it was determined that Barnes' and Ringler's DNA were on the grip and Ringler's blood was on the end of the bat. Id. at 439, 476-77, 494.

Based on this record, even if counsel never asked Leiss whether she felt Barnes' story was sincere there is no reasonable probability that the jury would have found he acted in self-defense. Barnes' multiple statements were

inconsistent with each other and inconsistent with other evidence, which hurt his credibility more than Leiss' belief in Barnes' sincerity. More importantly, however, Barnes admitted the initial altercation ended and the men had fled the scene, at which point Barnes retrieved an aluminum bat, chased down the victim, and hit him in the head with the bat. If the victim was running away from him like he stated, then Barnes no longer could reasonably believe that he was in fear of imminent danger of death or great bodily harm. The zone of emergency had ended, yet Barnes still pursued. Such facts do not support a self-defense theory under Florida law. See Cruz v. State, 189 So. 3d 822 (Fla. 4th DCA 2015) (finding facts did not support self-defense where, among other factors, defendant armed himself after the initial fight was over and reengaged the victims). Upon review of Barnes' own incriminating statements, particularly those said to Leiss, the Court finds no evidence supporting a conclusion that it was reasonable for Barnes to use deadly force because he no longer faced an imminent threat at the time he used the bat. See Marmol v. State, 750 So. 2d 764, 766 (Fla. 3d DCA 2000) ("Under these circumstances the defendant could not have reasonably believed that he was in 'imminent danger of death or great bodily harm,' from an unarmed man who was running away."). Accordingly, Barnes has failed to establish prejudice and, in turn, the existence of a constitutional violation. As such, his claim for relief in Ground One is due to be denied.

## B. Ground Two

As Ground Two, Barnes asserts that the circuit court erred in admitting testimony from Barnes' employer that he was sent home early from work because he arrived intoxicated. Amended Petition at 26-37. According to Barnes, this testimony was irrelevant as it did not tend to prove or disprove any material fact in his case. Id. Barnes contends that because there was a five-hour gap between when he got sent home and when the incident occurred, this evidence amounted to nothing more than an attack on his character, which is impermissible. Id. Barnes maintains that although this testimony was brief, the State focused on it during their closing arguments so much that it rendered his trial fundamentally unfair. Id. He also asserts that this testimony constituted collateral act evidence that the State failed to properly disclose. Id.

The record reflects that at trial, the prosecution called Jeffrey Hoff, Barnes' boss, as a witness. Resp. Ex. B at 455-64. He testified that Barnes came to work at 4:00 p.m. but was sent home, not because they did not need him, but because he appeared intoxicated and had an altercation with another employee. Id. at 458-59. Defense counsel objected, and the following occurred:

> MR. BEARD: Objection, Your Honor, irrelevant. May we approach?
>
> MS. ANUM: May we approach?
>
> THE COURT: Overruled.

MS ANUM: May I have one moment with counsel, Your Honor?

THE COURT: You may.

Id. Thereafter, the prosecutor asked a few more questions concerning Barnes' apparent intoxication and a "dispute" with another employee, and then she tendered the witness to the defense. Id. at 459. Barnes raised this issue on direct appeal. Resp. Ex. C. The First DCA per curiam affirmed Barnes' conviction and sentence without a written opinion. Resp. Ex. E.

To the extent that the First DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Barnes is not entitled to relief on the basis of this claim.

Nevertheless, even if the First DCA's adjudication of this claim is not entitled to deference, the claim in Ground Two is meritless. As the Eleventh Circuit has explained:

> Federal courts generally do not review a state court's admission of evidence in habeas corpus proceedings.

> McCoy v. Newsome, 953 F.2d 1252, 1265 (11th Cir.
> 1992). However, where a state court's ruling is claimed
> to have deprived a defendant of his right to due
> process, a federal court should inquire whether the
> error was of such magnitude that it denied
> fundamental fairness to the trial. Baxter v. Thomas,
> 45 F.3d 1501, 1509 (11th Cir. 1995). A denial of
> fundamental fairness occurs whenever the improper
> evidence is material in the sense of a crucial, critical,
> highly significant factor. Id. Evidence is not crucial,
> critical, or highly significant when other evidence of
> guilt is overwhelming. McCoy, 953 F.2d at 1265.
> Moreover, the court must defer to a state court's
> interpretation of its own rules of evidence and
> procedure. Machin v. Wainwright, 758 F.2d 1431, 1433
> (11th Cir. 1985).

Smith v. Sec'y, Fla. Dep't of Corr., 743 F. App'x 386, 388 (11th Cir. 2018).

"Relevant evidence is evidence tending to prove or disprove a material fact." §

90.401, Fla. Stat.

As explained in greater detail above, before talking to police, Barnes had

a conversation with Leiss. Id. at 366-89. Barnes initially said that after he

drove two men he picked up to their location, he got in a fight with the men

because they did not pay him gas money. Id. at 367. According to Barnes, after

the scuffle he retrieved his bat from his car, chased the men down, and beat

them with a bat. Id. at 366-89. Leiss implored him to call the police, which he

eventually assented to doing, telling Leiss that he was going to tell the police

the "he dropped the guys off and they tried to rob him." Id. at 389. During the

police interview, Barnes said that he went into work but "[t]hey didn't need me

at work so I ended up going to a convenience store," where he met Ringler and another man Id. at 422. From there, Barnes asserted that he drove the men to the trailer park, parked the car, went to go urinate by a tree, and was attacked by the two men. Id. at 422-33.

The prosecution called Hoss, among other witnesses, to refute Barnes' statements to police. Specifically, Hoss was used to show that Barnes was not sent home from work because he was not needed and that he had been drinking since before 4:00 p.m. In that same vein, the prosecution called Blest to discredit Barnes' story that he was attacked. Instead, they showed that Barnes lied and in fact spent time with Ringler drinking in a trailer near the scene. This evidence was not used to prove Barnes had a propensity to be drunk or aggressive but was used to discredit Barnes' story to police and to better understand Barnes' state of mind leading up to the incident. All of which was relevant to support the State's theory of the case.

Regardless, even if this evidence was irrelevant, it cannot be said that its admission resulted in the denial of fundamental fairness at Barnes' trial. As discussed above, Barnes told Leiss that he chased down and attacked the victim with a bat at a point in time where any imminent threat to his life had ceased. Therefore, Hoss' testimony was not crucial or critical because the other evidence of Barnes' guilt was overwhelming. As such, Barnes has failed to establish a constitutional violation. See Smith, 743 F. App'x at 388.

Accordingly, Barnes is not entitled to federal habeas relief and the claim in Ground Two is due to be denied.

## VII. Certificate of Appealability

## Pursuant to 28 U.S.C. § 2253(c)(1)

If Barnes seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Barnes "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial

23

of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Amended Petition (Doc. 3) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

3.      If Barnes appeals the denial of the Amended Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of May, 2021.

MARCIA MORALES HOWARD
United States District Judge

Jax-8

C:     Santi Barnes #581943
       Counsel of record